

United States Courts
Southern District of Texas
FILED

JAN 1 1 2017

David J. Bradley, Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF TEXAS, *ex rel.* LOREN RICHARDS<br><br>    Relator,<br><br>        v.<br><br>SEALY HOLDINGS, LLC, d/b/a MEDICAL CLINICS OF SEALY, and KANNAPPAN KRISHNASWAMY,<br><br>    Defendants. | Civil Action No. _____<br><br><br>**ORIGINAL COMPLAINT FOR: Violations of False Claims Act, 31 U.S.C. § 3729 *et seq.* and Texas Medicare Fraud Prevention Act, Tex. Hum. Res. Code §§36.001, *et seq.***<br><br>**FILED <u>IN CAMERA</u> AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)**<br><br>    JURY TRIAL DEMANDED |

## <u>COMPLAINT</u>

Relator Loren Richards, for her complaint against Sealy Holdings, LLC, d/b/a Medical Clinics of Sealy ("MCS"), and Kannappan Krishnaswamy (collectively, "Defendants"), alleges as follows:

1.    This action is brought on behalf of Relator and the United States pursuant to the False Claims Act, 31 U.S.C. sections 3729, *et seq.*, and on behalf of the State of Texas pursuant to Tex. Hum. Res. Code §§36.001, *et seq.*

2.    This action concerns false and fraudulent statements, reports and claims for payment that Defendants routinely and intentionally submitted to federal and Texas government programs, including Medicare, Medicaid, CHAMPVA, TRICARE, and/or CHAMPUS (hereinafter, the "Government"), and to various Medicare Advantage

Organizations ("MAOs") which indirectly resulted in fraudulent claim submission to federal and Texas government programs.

## I. JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

4.      This Court has personal jurisdiction and venue over Defendants pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a). Jurisdiction is proper over the Defendants because the Defendants can be found in, reside in, and/or have transacted business within this Court's jurisdiction, and some of the acts in violation of 31 U.S.C. § 3729 occurred within this district.

5.      In addition, this Court has jurisdiction under the doctrine of supplemental jurisdiction over the state law claims pleaded or which may be pleaded to the extent that these claims arise out of a common nucleus of operative facts under 28 U.S.C. §1367(a).

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) & (c) and 31 U.S.C. § 3732(a) because at least one Defendant resides in or transact business in this district and because a substantial portion of the events or omissions giving rise to the claims alleged herein occurred in this district. Relator is familiar with Defendants' fraudulent billing practices alleged in this Complaint and is aware that the pervasive misconduct at issue occurred in this District.

7.      This case is not based on a public disclosure within the meaning of the FCA, and Relator is the original source of the allegations contained herein. Relator has direct and independent knowledge of the alleged fraud and disclosed this information to

the government before filing suit, pursuant to 31 U.S.C. § 3730(e)(4)(B). Relator believes that there has been no public disclosure of these allegations and transactions such that subparagraph (e)(4) does not apply and this disclosure was not necessary. However, as a precautionary measure, in the event there has been a public disclosure, Relator made this pre-complaint disclosure in order to qualify as an "original source" under subparagraph (e)(4)(B)(2). Relator has knowledge that is independent of, and materially adds to, any publicly disclosed allegations or transactions, and voluntarily provided the information to the Government before filing her False Claims Act complaint.

## II. PARTIES

8.      Relator Loren Richards is a former employee of Sealy Holdings, LLC, and a resident of Harris County, Texas.

9.      Sealy Holdings, LLC ("Sealy Holdings") is a Texas limited liability company headquartered in Sealy, Texas, and incorporated in Texas. Sealy Holdings does business as "Medical Clinics of Sealy" in Sealy, Texas, in the Southern District of Texas. Its website is www.succmc.com. Sealy Holdings' president, manager, director and registered agent for service is Dr. Kannappan Krishnaswamy. Its registered address for service and principal place of business is 1036 N. Circle Dr., Sealy, TX 77474-3336.

10.     The United States is herein named as a Plaintiff pursuant to the False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.*, as funds of the United States have been directly or indirectly paid to Defendants, as a result of the knowingly false claims, records and statements alleged in this Complaint that Defendants made or caused to be made.

11.     The State of Texas is herein named as a Plaintiff pursuant to the Texas Medicare Fraud Prevention Act, Tex. Hum. Res. Code §§36.001, et seq., as funds of the State of Texas have been directly or indirectly paid to Defendants, as a result of the knowingly false claims, records and statements alleged in this Complaint that Defendants made or caused to be made.

## III. FACTS

12.     Relator Loren Richards graduated in 2011 from Virginia College in Austin, Texas, with an associate's degree in applied science, and a specialty in diagnostic medical sonography. She obtained her certification as a registered vascular technologist (RVT) from the American Registry for Diagnostic Medical Sonography ("ARDMS"), which is recognized as the international standard in credentialing for various professions, including ultrasound technologists, like Relator. To earn her RVT and RMSKS credential, she also passed the Sonography Principles & Instrumentation ("SPI") examination, which tests basic physical principles and instrumentation knowledge essential to sonography professionals.

13.     Relator worked for MCS from March 1, 2015 to November 1, 2016. Before hiring Relator, MCS used a contract imaging service to come to MCS one day per week to do imaging for MCS's patients.

14.     MCS decided to stop contracting out its imaging services and purchased an ultrasound machine, so it could perform ultrasound tests in-house. MCS knew nothing about ultrasound technology and billing for ultrasound examinations, and hired Relator to run the department.

15.     Relator was hired by MCS as its first and only ultrasound tech on March 1, 2015. Relator was the only ARDMS-certified person at MCS and she enabled MCS to

4

become accredited by ACR (the American College of Radiology), which permitted MCS to bill Medicare and Medicaid for ultrasounds.

16.     During the first week of May 2016, Relator left MCS to go on maternity leave. She returned to work in July 2016. During the time she was gone from MCS, MCS was without a RVT and unable to perform ultrasound scans, and thus unable to generate income from the ultrasound machine it has purchased. MCS was forced to contract out its ultrasounds, at significant expense to MCS.

17.     When Relator returned to MCS after her maternity leave, she noticed a strong push to generate income from the ultrasound machine. She was told that there was a quota of ultrasounds that needed to be performed each day in order to justify her salary. First, she was told that the quota was 8 per day; then she was told the quote was 5 per day. All staff at MCS were expected to help meet the quota and ensure that the requisite number of ultrasound scans were performed each day, without regard to whether the scans were necessary for MCS's patients.

18.     MCS had 5 to 8 nurse practitioners and physician's assistants (NP's and PA's, respectively) who worked with Dr. Krishnaswamy and ordered imaging tests, including ultrasounds, x-rays, and CAT scans.

19.     MCS's NP's included: (1) Ponmary Thomas (the head NP), (2) Luba Yasmine, (3) Sean James McDougall, (4) Altaf Raja, (5) Jibi Thamaravelil, and (6) Ashley D. Hollins.

20.     MCS's PA's included Fatema Amiji.

21.     MCS has a very high turnover rate for NP's and PA's because once they see the unethical practices going on at MCS, and learn that these practices are

deliberate and will not change, they tend to quit. Relator quit for these reasons in October 2016 and her last day was November 1, 2016.

22.    Relator recently learned from her former supervisor, Richard Saucedo, that an NP quit in January 2017 after being with MCS for less than one week. She also recently learned that 2 staff members involved in billing for MCS (Alicia and Christina, last names unknown) also quit in January 2017.

23.    While employed by MCS, Relator witnessed a standard practice of fraud on the Medicare and Medicaid systems by MCS as directed by Dr. Kannappan Krishnaswamy, the sole owner, director and officer of MCS, and carried out by Dr. Krishnaswamy and the PA's and NP's employed at MCS.

24.    MCS's NP's and PA's would routinely order excessive and unnecessary ultrasound tests on Medicare and Medicaid patients in order to maximize MCS's revenue from the Government.

25.    For example, in or around August - October 2016, Relator was ordered to perform a bilateral ultrasound on **Patient A**'s legs (meaning an ultrasound on both legs). When Relator spoke to Patient A during the procedure, Patient A told her that she had pain in her right toe. When Relator asked Shaun, the NP, why he ordered ultrasounds on both legs, Shaun told her to alter the medical records to falsely state that the patient was complaining about pain in both legs. Relator was told that the standard practice (under the orders of Dr. Krishnaswamy) was to order bilateral ultrasounds because that allowed MCS to bill the Government a higher amount.

26.    As another example, in or around August - October 2016, **Patient B** came in to MCS's clinic complaining of migraine headaches. One of the NP's ordered a

6

carotid artery ultrasound. Carotid ultrasounds are referred to as non-invasive Cerebrovascular Arterial Studies and are covered by Novitas Solutions' Local Coverage Determinations (LCD's) discussed below.

27.     Relator knew that ultrasound scans were not necessary and were not approved for migraines, and mentioned this to Dr. Krishnaswamy. Dr. Krishnaswamy instructed her to type into her ultrasound notes that the patient was also complaining about dizziness (which was not true) in order to make the ultrasound appear necessary. Dr. Krishnaswamy never saw the patient or the patient's chart and simply ordered Relator to enter "dizziness" into her ultrasound notes in order to make the ultrasound tests appear to be necessary.

28.     As another example, in or around August - October 2016, **Patient C** came in to the clinic complaining of neck pain. One of the NP's ordered an ultrasound. Relator knew that ultrasound scans were not necessary and were not approved for complaints of general neck pain or pain when swallowing, and mentioned this to Dr. Krishnaswamy. Dr. Krishnaswamy instructed her to type into her ultrasound notes that they needed to check the patient for hypothyroidism (which was not true) in order to make the ultrasound appear necessary. It is not reasonable or necessary to perform an ultrasound test to check for hypothyroidism based solely on a complaint of neck pain or difficulty swallowing. An ultrasound to check for hypothyroidism is only reasonable when a blood test indicates the possibility of hypothyroidism.

29.     As another example, in or around August - October 2016, **Patient D** came in to the clinic showing signs of dementia. One of the NP's ordered a carotid ultrasound. Relator knew that ultrasound scans were not necessary and were not approved for

dementia, and mentioned this to Dr. Krishnaswamy. Dr. Krishnaswamy instructed her to type into her ultrasound notes that they needed to check for syncope (fainting due to insufficient blood flow to the brain), in order to make the ultrasound appear necessary, even though there was no patient complaint of fainting. In other similar instances, Dr. Krishnaswamy would instruct her to type into her ultrasound notes that the patient was complaining of bruit (abnormal sound generated by turbulent blood flow in an artery), which was not true, in order to justify the ultrasound.

30.    As another example, in or around August - October 2016, **Patient E** came in to the clinic with symptoms requiring a venous ultrasound exam. However one of the NP's ordered arterial and venous ultrasounds scans. Relator knew that the symptoms only required a venous ultrasound. Arterial and venous symptoms are different. For example, complaint of a black or cold foot or lack of pulse in a foot is indicative of an arterial problem, and not a venous problem. A venous problem is a DVT (deep vein thrombosis) or blood clot, and will present with a red swollen foot and/or a build up of fluid. The symptoms are totally different. These are some of the most common issues that RVT's deal with. Dr. Krishnaswamy knew that it was wrong to order arterial and venous ultrasounds when a patient's symptoms only required one or the other, but he routinely ordered Relator to do it anyway for Medicare and Medicaid patients in order to maximize revenue obtained fraudulently from the Government.

31.    In each of these examples (and hundreds of similar examples), Dr. Krishnaswamy would tell Relator to enter false information in her notes, even though he knew the information was false. Dr. Krishnaswamy knew nothing about the patient, and

never saw the patient's chart or spoke to the treating NP or PA, and thus had no basis for instructing Relator to change what she entered in her ultrasound notes.

32.     Dr. Krishnaswamy also took shifts in the ER (emergency room) connected to MCS. When in the emergency room, Dr. Krishnaswamy did not order unnecessary ultrasounds because he was unable to profit from them in the manner he did in the MCS clinic.

33.     Relator regularly saw ultrasound tests ordered that were not appropriate for the patient's symptoms and diagnoses in situations like those listed above. When Relator witnessed these orders for unnecessary ultrasound tests, she would complain to the doctor, NP or PA who ordered the tests, and explain to them that the ultrasounds ordered were not appropriate or necessary for the diagnosis or complaints listed in the patient's charts. This happened hundreds of times during the 20 months Relator worked at MCS.

34.     The fraud alleged in this Complaint can be detected by comparing the ultrasound notes (typed in by Relator when she performed ultrasound scans) to the charts of the patients (which lists their actual complaints and symptoms). When Relator was forced to perform unnecessary ultrasound tests on patients, she was forced to enter false information about the patient's conditions into the ultrasound machine (manufactured by a Chinese company called Mindray), to make the tests seem appropriate and necessary. However, frequently the false information was not also entered into the patient's chart. Accordingly, Relator's notes typed in to the ultrasound record (which make the ultrasound appear to have been necessary) will frequently

include false information that does not match the accurate information in the patient's charts (which will show that an ultrasound was not necessary).

35.     Similar to the routine practice of ordering unnecessary ultrasound testing, MCS also ordered unnecessary x-rays and CAT scans, as confirmed to Relator by Richard Saucedo, the director of radiology at MCS who performed the x-rays and CAT scans ordered for patients at MCS. As with Relator, Saucedo was forced to perform unnecessary x-rays and CAT scans of Medicare and Medicaid patients in order to defraud the government, and was forced to falsify his notes regarding the need for the tests.

36.     Saucedo knew that it was wrong to perform the unnecessary tests under pressure by Dr. Krishnaswamy. He used to joke that when the illegal activity is eventually uncovered and the police show up, he will just say that he cannot speak English.

37.     Saucedo, like Relator, lacked the authority to refuse to perform the scans. They were techs and forced to do what they were told by the doctors, PA's, and NP's at MCS. Saucedo obtained ACR accreditation for MCS for x-rays and CAT scans in the same manner that Relator obtained accreditation for ultrasounds.

38.     MCS does not employ radiologists. The ultrasound scans performed by Relator (as well as the CAT scans and x-rays performed by Saucedo) are sent out via the internet to off-site third-party tele-radiologists (referred to as telerads) who read and analyze the ultrasound, x-ray, and CAT scans. This is done through a company in Littleton, Colorado, called Rays (formerly NightRays). The scans, as well as the information typed in by Relator and Saucedo, are sent to Rays.

39.     Relator was forced to enter false information into her Mindray ultrasound machine, because otherwise the Rays telerads reading the scans and the notes she typed into the system would realize that the scans being performed were not necessary based on the complaints and symptoms of the patients not requiring the type of scans being performed.

40.     Often the patients would realize that the ultrasound tests being performed on them were not appropriate for their symptoms and complaints (for example, when a patient complaining of toe pain in one foot received ultrasound scans on both legs).

41.     When patients were covered by private insurance, MCS would have to get pre-approval from the insurance company of an ultrasound, x-ray, or CAT scan before performing the test. However, for patients covered by Medicare or Medicaid, MCS was able to perform the tests and then falsify the notes typed in with the test, to make the tests appear to be appropriate and necessary should CMS ever attempt to audit the records and not know to compare the ultrasound notes to the patient charts.

42.     Multiple doctors, NP's and PA's at MCS, including Ms. Luba and Shaun, admitted to Relator that they routinely ordered unnecessary ultrasound, CAT scan, and x-rays for patients under pressure by Dr. Krishnaswamy, to maximize revenue by performing unnecessary and excessive tests.

43.     In October 2016, Relator could no longer tolerate the unethical conduct at MCS and gave notice that she would be quitting her job, leaving MCS without an ARDMS-certified ultrasound technologist on staff. Her last day was November 1, 2016.

44.     On her last 2 days, she trained her replacement, a woman named Lisie Chirayil. Ms. Chirayil is not a registered vascular technologist. According to the ARDMS

11

directory, she is an RDMS (registered diagnostic medical sonographer) who was certified for abdominal ultrasounds in 2005 and for breast ultrasounds in 2016. She is not an RVT (registered vascular technologist) and CMS regulations prohibit Defendants from billing CMS for her unlicensed performance of vascular ultrasound scans.

45.    MCS still bills the Government for vascular ultrasounds even though there are no licensed accredited RVT's on staff. CMS regulations require that an RVT perform ultrasounds in order for CMS to pay for those services. Upon information and belief, MCS is still using Relator's RVT number to bill CMS for the ultrasound scans performed by Ms. Chirayil.

## IV. THE MEDICARE PROGRAM

46.    In 1965, Congress passed Title XVIII of the Social Security Act to pay for certain healthcare services for eligible individuals. 42 U.S.C. §§ 1395 et seq. Medicare Part A covers hospitalization costs, services rendered by skilled nursing facilities, home health care, and hospice care, while Part B covers physician services, outpatient care, and other miscellaneous services such as physical therapy. See 42 U.S.C. §§ 1395j-1395w-4.

47.    The U.S. Department of Health and Human Services ("HHS") is a federal agency whose activities, operations, and contracts are paid from federal funds. The Center for Medicare and Medicaid Services ("CMS") is a division of HHS that administers the Medicare program. To administer Medicare reimbursement claims, HHS contracts with private local insurance companies, known as "carriers" and "fiscal intermediaries," to review and pay appropriate reimbursement claims related to services provided to Medicare beneficiaries. See 42 U.S.C. § 1395u. Providers such as MCS are legally obligated to familiarize themselves with Medicare's reimbursement rules,

12

including those set forth in the Medicare Manuals. *Heckler v. Cmty. Health Serv. of Crawford County, Inc.,* 467 U.S. 51, 64-65 (1984).

48.    The Secretary of HHS has broad statutory authority to "prescribe such regulations as may be necessary to carry out the administration of the [Medicare] insurance programs ..." 42 U.S.C. §1395hh(a)(1). In addition to promulgating regulations, the Secretary has the power to formulate rules for the administration of the Medicare programs, through the issuance of manual instructions, interpretive rules, statements of policy, and guidelines of general applicability. 42 U.S.C. §1395hh(c)(1).

49.    To submit Medicare reimbursement claims, providers submit an Electronic Data Interchange Enrollment Form which contains several provisions, including one that states: "anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this Agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." Medicare only pays for services that are "reasonable and necessary for the diagnosis or treatment of illness or injuy." 42 U.S.C. § 1395y(a)(I)(A). It is illegal to provide and bill for medically unnecessary services and equipment. Seeking payment for medically unnecessary services is an act designed to obtain reimbursement for a service that is not warranted by the patient's current and documented medical condition.

50.    In addition to violating the general Medicare rule that only allows billing for services reasonable and necessary for the diagnosis or treatment of illness or injury, MCD also violated specific regulations and Local Coverage Determinations.

51.    In Texas, Novitas Solutions is the MAC for Medicare Type A and B claims. Novitas issues LCD's (Local Coverage Determinations), including LCD L35397, applicable to non-invasive Cerebrovascular Arterial Studies (which is a carotid ultrasound, as discussed in the example above).

52.    This LCD provides as follows: All non-invasive vascular diagnostic studies performed by a technologist must be performed by, or under the direct supervision of, a technologist who has demonstrated competency by being credentialed in vascular technology, or performed under the direct supervision of a physician capable of demonstrating training and experience specific to the study performed, or such studies must be performed in a facility accredited by the Intersocietal Accreditation Commission – Vascular Testing (formerly ICAVL) or the Non-Invasive Vascular Ultrasound Accreditation of the American College of Radiology (ACR).

53.    Examples of appropriate certification provided by the LCD include the Registered Vascular Technologist (RVT) credential and the Registered Cardiovascular Technologist (RCVT) credential in Vascular Technology. Direct supervision requires the credentialed individual's presence in the facility and immediate availability to the technologist performing the study

54.    Novitas has also issued a similar LCD for Non-invasive Peripheral Venous Studies. This LCD requires a physician to maintain documentation for post-payment audit and requires that all noninvasive vascular diagnostic studies performed by a technologist must be performed by, or under the direct supervision of, a technologist who has demonstrated competency by being credentialed in vascular technology, or, such studies must be performed in a facility accredited by the Intersocietal Accreditation

14

Commission – Vascular Testing (formerly ICAVL) or the Non-Invasive Vascular Ultrasound Accreditation of the American College of Radiology. Direct supervision requires the credentialed individual's presence in the facility and immediate availability to the technologist performing the study.

55.     Novitas issued LCD ID #: L34924, applicable to Treatment of Varicose Veins and Venous Stasis Disease of the Lower Extremities, which has similar rules for those studies.

**56.**     The LCD's applicable to ultrasound testing all recognize that the accuracy of non-invasive diagnostic testing studies depends on the knowledge, skill and experience of the physician and/or technologist performing and interpreting the study, and require that both must maintain proof of the required training and experience.

## V. THE FALSE CLAIMS ACT

57.     The False Claims Act provides, *inter alia*, that any person who--

> (A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C)     conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); . . . or
>
> (G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of

damages which the Government sustains because of the act of that person.

31 U.S.C.A. § 3729 (a)(1)(A-G).

58.   The term "claim" includes "any request or demand, whether under a contract or otherwise, for money . . . that—

(i)   is presented to an officer, employee, or agent of the United States; or

(ii)   is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)   provides or has provided any portion of the money or property requested or demanded; or

(II)   will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . .

31 U.S.C.A. § 3729 (a)(2).

59.   Any person who knowingly submits a false or fraudulent claim to the Government for payment or approval (or to a contractor if the money is to be spent on the Government's behalf or to advance a Government program and the Government provides any portion of the money requested or demanded) is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each claim, plus three times the actual damages that the Government sustained.   31 U.S.C. § 3729(a).   The Act also permits assessment of the civil penalty even without proof of specific damages.

60.   The FCA defines a "claim" for payment to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any

portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c). Accordingly, pursuant to the express language of the FCA and the statutory definition of "claim," Medicaid claims submitted to state Medicaid agencies are considered to be claims presented to the federal government, and thus may give rise to liability under the FCA.

## VI. THE TEXAS MEDICAID FRAUD PREVENTION ACT

61. The Texas Medicaid Fraud Prevention Act ("TMFPA") TEX. HUM. RES. CODE §36.002, provides, *inter alia*, that a person commits an unlawful act if the person:

(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

  ....

(4) knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

  ....

(B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

  ....

(6) knowingly presents or causes to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who:

(A) is not licensed to provide the product or render the service, if a license is required; or

      (B)    is not licensed in the manner claimed;

(7)    knowingly makes or causes to be made a claim under the Medicaid program for:

      (A)    a service or product that has not been approved or acquiesced in by a treating physician or health care practitioner;

      (B)    a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or

      ....

(8)    makes a claim under the Medicaid program and knowingly fails to indicate the type of license and the identification number of the licensed health care provider who actually provided the service;

(9)    conspires to commit a violation of Subdivision (1), (2), (3), (4), (5), (6), (7), (8), (10), (11), (12), or (13);

      ....

(12)    knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program

TEX. HUM. RES. CODE § 36.002.

62.    The term "claim" includes "a written or electronically submitted request or demand that:is signed by a provider or a fiscal agent and that identifies a product or service provided or purported to have been provided to a Medicaid recipient as reimbursable under the Medicaid program, without regard to whether the money that is requested or demanded is paid." TEX. HUM. RES. CODE §§36.001(1)(A).

63.    A person who commits an unlawful act is liable to the State of Texas for:

(1) the amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful act, including any payment made to a third party;

(2)   interest on the amount of the payment or the value of the benefit described by Subdivision (1) at the prejudgment interest rate in effect on the day the payment or benefit was received or paid, for the period from the date the benefit was received or paid to the date that the state recovers the amount of the payment or value of the benefit;

(3)   a civil penalty of:   (A)   not less than $ 5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $ 5,500, and not more than $ 15,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $ 15,000, for each unlawful act committed by the person that results in injury to an elderly person, as defined by Section 48.002(a)(1), a disabled person, as defined by Section 48.002(a)(8)(A), or a person younger than 18 years of age; or   (B)   not less than $ 5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $ 5,500, and not more than $ 11,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $ 11,000, for each unlawful act committed by the person that does not result in injury to a person described by Paragraph (A); and

(4)   two times the amount of the payment or the value of the benefit described by Subdivision (1).

TEX. HUM. RES. CODE § 36.052(a).

64.   Under subparagraph (a)(1) above, a person who has committed an unlawful act is liable to the state for the entire amount of the payment or benefit provided under the Medicaid program directly or indirectly as a result of the unlawful act, with no obligation on the state to show that the payment or benefit is an "overpayment," or "damage," or would not have been paid "but for" the unlawful act.

## VII.  MCS'S VIOLATIONS OF THE FCA AND TMFPA

65.   MCS routinely and systematically violated the FCA and TMFPA by wrongfully obtaining and retaining substantial funds from Government healthcare programs—including but not limited to Medicare, Medicaid, Tricare/CHAMPUS, and the Veterans Administration ("VA")—through false claims and false statements made in

connection with medical services provided by MCS, since at least 2015 and likely much earlier.

66.    MCS knowingly submits these false claims through a variety of improper schemes, including but not limited to (1) performing unnecessary ultrasounds, CAT scans, and x-rays, and attempting to justify them by falsifying information typed in with those tests regarding the patient's condition, symptoms and/or complaints; (2) billing for tests performed and supervised by unlicensed and unqualified individuals and using the licensing information of persons no longer employed at MCS or not supervising the procedures; (3) upcoding DRG and diagnosis codes and seeking payment for upcoded procedures when less expensive procedures were performed; and (4) billing for services without the requisite documentation supporting the medical necessity of services billed.

67.    MCS's false and fraudulent schemes prey on and cause harm to a socio-economically vulnerable patient population and have defrauded the Government out of large sums of money.

68.    Patients would frequently be admitted to MCS with a condition suitable for a lower, less serious, DRG code, only for Dr. Krishnaswamy to after-the-fact communicate with NP's and PA's and instruct them to write documentation that supports a higher DRG code.

69.    MCS upcodes DRG codes and seeks payment for upcoded treatment and procedures when either less expensive procedures were performed, more expensive procedures were not medically necessary, or coded treatment was never provided.

70.    MCS is required to list each diagnosis code at the highest level of specificity for which a patient is receiving medical care. A patient's primary diagnosis is supposed to reflect the main condition that initially necessitated the office visit or hospitalization. The level of reimbursement provided to a medical services provider under Medicare and other government healthcare programs is determined partially by the primary diagnosis for each patient, which, during the relevant time periods, corresponds to codes set forth by the Center for Disease Control called ICD-9-CM ("International Classification of Diseases, Ninth Revision, Clinical Modification")) or ICD-10-CM (tenth revision of same) codes.  Some codes have higher reimbursement values than others.

71.    Since at least 2015, and continuing through the present, MCS has engaged in a pattern of falsely upcoding patients' DRG and corresponding ICD-9-CM or ICD-10-CM codes in order to obtain increased payments from Medicare and other Government programs. MCS accomplished this by (1) upcoding procedures when, in fact, less expensive ones were performed; and (2) performing more expensive procedures that were in no way medically necessary.  Through all these mechanisms, as a result of the upcoding scheme, MCS received reimbursements from the government at a higher level than that to which it was entitled.

72.    MCS bills for services without documentation that demonstrates their medical necessity. Since at least 2015 and continuing through the present, MCS has engaged in a pattern of routinely billing Medicare and other government healthcare programs without possessing sufficient documentation illustrating that the services were either reasonable or necessary. As described above, the false information typed in to

the ultrasound, CAT scan, and x-ray systems by Saucedo are not supported by the patient charts, which often contain accurate information about patients' conditions.

## VIII.  CAUSES OF ACTION

### COUNT ONE

### FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(A)

73.     Paragraphs 1-69 of this Complaint are incorporated herein by reference.

74.     Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to officers or employees of the United States Government.

75.     As a result of these false or fraudulent claims, the United States Government suffered damages.

76.     By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, as follows:

77.     Defendants submitted false claims for ultrasound, X-ray, and CAT scans provided to patients, which scans Defendants knew did not meet Medicare or Medicaid requirements (because they were unnecessary and/or excessive for the conditions presented by the patients, and/or because they were provided by an unlicensed, uncertified, and unsupervised individual).

78.     Defendants submitted false claims for these services premised upon Defendants' fraudulent certifications of compliance with Medicare regulations.

79.     The United States paid the false claims described herein.

80.   Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant by the United States through Medicare and Medicaid for such false or fraudulent claims.

81.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented to the United States false or fraudulent Medicare claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

82.   By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015.).

## COUNT TWO

### FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(B)

83.   Paragraphs 1-69 are incorporated herein by reference.

84.   Defendants knowingly made, used, or caused to be made or used, false records and statements material to the United States Government's payment of false or fraudulent claims.

85.   As a result of these false records or statements, the United States Government suffered damages.

86.   By virtue of the acts described above, Defendants knowingly made or used a false record or statement to get a false or fraudulent Medicare claim paid or

approved by the United States, in violation of the False Claims Act, 31 U.S.C. §

3729(a)(1)(B); that is, Defendants knowingly made or used or caused to be made or

used false Medicare claim forms, false supporting materials, such as internal billing

forms, false information typed into ultrasound, x-ray and CAT scan reports, and false

certifications of the truthfulness and accuracy of claims submitted, to get false or

fraudulent Medicare claims paid or approved by the United States.

87.    By reason of the foregoing, the United States suffered actual damages in

an amount to be determined at trial; and therefore is entitled to treble damages under

the False Claims Act, plus civil penalties as permitted by 31 U.S.C. § 3729, and as

adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the

Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099,

47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or

before November 2, 2015, and between $10,781 and $21,563 for conduct after

November 2, 2015.)

### COUNT THREE

### FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(G)

88.    Paragraphs 1-69 are incorporated herein.

89.    Had Defendants provided accurate information in association with the

scans discussed above, Defendants would have had to disgorge improperly obtained

payments from CMS. By knowingly providing this false information, Defendants

knowingly made, used or caused to be made or use, a false record or statement

material to an obligation to pay or transmit money to the Government, and/or knowingly

concealed or knowingly and improperly avoided or decreased an obligation to transmit

money to the Government.

90.    As a result of those false records and statements, and knowing concealment and improper avoidance, the United States Government has suffered damages.

## COUNT FOUR

### TEXAS MEDICAID FRAUD PREVENTION ACT

91.    All allegations in this Complaint are incorporated herein by reference.

92.    Relator brings this Qui Tam action on behalf the Texas Government to recover treble damages and civil penalties under the Texas Medicaid Fraud Prevention Act ("TMFPA"), Tex. Hum. Res. Code §§36.001, *et seq.*

93.    Under Texas Human Resources Code § 36.002, a person may bring a civil action for violation of the TMFPA in the name of the State of Texas in the same manner as a person may bring an action for the federal government under the federal False Claims Act.

94.    The TMFPA mirrors the federal False Claims Act, and Defendant violated those provisions of TMFPA (codified at Tex. Hum. Res. Code §§36.002) that mirror the provisions of the federal False Claims Act described above, in wrongfully obtaining payment on false claims from the State of Texas.

95.    Pursuant to Tex. Hum. Res. Code §§36.052, Defendant is liable for the amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful act, including any payment made to a third party; interest; a civil penalty in the range set forth by the False Claims Act, as set forth above, and (for elderly, disabled and persons under 18) in the

range of $5,500 to $15,000, and two times the amount of the payment or the value of the benefit described above.

## PRAYER

WHEREFORE, Relator prays for the following relief for her FCA claims:

1.      A permanent injunction requiring Defendants to cease and desist from violating the federal FCA;

2.      Judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of the Defendants' unlawful conduct;

3.      Civil monetary penalties for each false and fraudulent claim submitted to the United States by Defendants, as permitted by 31 U.S.C. § 3729, and as adjusted pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), or otherwise (currently, between $5,500 and $11,000 for conduct on or before November 2, 2015, and between $10,781 and $21,563 for conduct after November 2, 2015.)

4.      An award to Relator pursuant to 31 U.S.C. §3730(d) of reasonable attorneys' fees, costs, and expenses;

5.      Such other relief as the Court deems just and equitable.

WHEREFORE, Relator respectfully requests this Court award the following damages to the following parties and against Defendants for her TMFPA claims:

To the STATE OF TEXAS:

(a) Three times the amount of all payments made from the Medicaid program either directly to Defendant, or to an MCO for any of Defendant's patients;

(b) A civil penalty of not less than $5,500 and not more than $11,000 (or $15,000 for elderly, disabled and minors) for each false claim Defendants presented or caused to be presented resulting in payment from the State of Texas to Defendant or to an MCO for any of Defendant's patients;

(c) Prejudgment interest;

(d) All costs incurred in bringing this action.

To Relator:

(a) The maximum amount allowed pursuant to TEX. HUM. RES. CODE §§36.110 and/or any other applicable provision of law;

(b) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(c) An award of reasonable attorneys' fees and costs; and

(d) Such further relief as this Court deems equitable and just.

## JURY DEMAND

Relator hereby demands a jury trial on all issues triable to a jury.


Dated: January 11, 2017

Respectfully submitted,


/s/ Cory S. Fein
CORY S. FEIN
CORY FEIN LAW FIRM
712 Main Street, Suite 800
Houston, TX 77002
(281) 254-7717
(530) 748 - 0601 (fax)
cory@coryfeinlaw.com


*For Relator, Loren Richards*